1

FILED

OCT 1 6 2009

Oct 16 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

William and Brenda Bush,                )
                                        )
            Plaintiffs,                 )
                                        )          1:09-cv-06522
      v.                                )          Judge Charles R. Norgle, Sr
                                        )          Magistrate Judge Michael T. Mason
GMAC Mortgage, LLC, Ernest J. Codilis,  )
Law Office of Ernest J. Codilis,        )
John Does 1-10                                     )
            Defendants.                 )          <u>Jury Demanded</u>


**COMPLAINT**

Plaintiffs, William and Brenda Bush ("The Bush's"), brings this action to secure redress

against unlawful credit and collection practices engaged in by Defendants GMAC, Ernest J.

Codilis and the Law Office of Ernest J. Codilis (Collectively "Defendants").

Plaintiffs allege violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et

seq., ("FDCPA") based upon Defendants' false, misleading, and/or deceptive representation

and/or implication that nonpayment of their debt would result in the sale of their property, even

though sale of their property would not be lawful under the circumstances. Also, Defendants

threatened and pursued an action, namely foreclosure, which could not legally be taken, even

after notification that the action could not legally be taken.

The FDCPA is broad in its prohibition of unfair or unconscionable collections methods

including the use of any false, deceptive or misleading statements in connection with the

collection of a debt. The FDCPA also prohibits threatening legal action that cannot be taken, and the collection of any amount of money not authorized by an agreement or permitted by law.

Plaintiffs allege Defendants violated provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 USC sec. 2601 et seq. by accepting charges for the rendering of real estate services which were in fact charges for other than services actually performed.

Plaintiffs allege Defendants violated provisions of the Federal Truth In Lending Act, 15 USC sec.1601 et seq. by calculating the annual percentage rate ("APR") based upon improperly calculated and disclosed amounts.

Plaintiffs allege Defendants violated provisions of the Fair Credit Reporting Act, 15 USC 1681 et seq, by wrongfully, improperly and illegally reporting negative information as to the Plaintiffs to one or more Credit Reporting Agencies, resulting in Plaintiffs having negative information on their credit reports and the lowering of their FICO scores. Plaintiffs disputed the erroneous information with Defendants, but Defendants refused to change the wrongful information reported to the Credit Reporting Agencies.

Plaintiffs allege Defendants knowingly and intentionally concealed material information from Plaintiffs which is required by Federal Statutes and Regulations to be disclosed to the Plaintiffs both before and at the closing. Defendants also materially misrepresented material information to the Plaintiffs with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

Plaintiffs allege Defendants breached their fiduciary duties to the Plaintiffs by fraudulently inducing Plaintiffs to enter into a mortgage transaction which was contrary to the

Plaintiffs' stated intentions; contrary to the Plaintiffs' interests; and contrary to the Plaintiffs' preservation of their home.

Plaintiffs allege that Defendants have been unjustly enriched at the expense of the Plaintiffs, and maintenance of the enrichment would be contrary to the rules and principles of equity.

Plaintiffs allege Defendants violated provisions of the civil RICO Act by their use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiffs.

Plaintiffs allege that Defendants never served them with Summons or Service of Process, and therefore did not obtain personal jurisdiction in their foreclosure matter.

In addition, Plaintiffs allege other claims pursuant to 28 USC 1337, common law fraud, RICO violations and other state claims which gives rise to the Court's Supplemental Jurisdiction.

## JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. §§1331, 1337, 15U.S.C. 1681P, and 15 U.S.C. §1692k (FDCPA).

2. This Court has Supplemental Jurisdiction to hear the State claims raised in this complaint.

3. Venue and personal jurisdiction over Defendants in this District is proper because:

a. William and Brenda Bush reside within the District;

b. On information and belief, Defendant Ernest Codilis resides within the District;

c. Defendant Ernest Codilis transacts business within the District by filing pleadings and representing clients; and

d. Defendant Law Office of Ernest Codilis has its office within the District and transacts business within the District by filing pleadings and representing clients.

e. Defendant GMAC Mortgage, LLC has its corporate office and registered agent within the District and conducts significant business transactions within the District.

## PARTIES

4. Plaintiffs William and Brenda Bush are individuals who reside in the District.

5. On information and belief, Defendant Ernest Codilis is an individual who resides in the District licensed as and attorney and regularly engaged in the practice of collecting debts

6. GMAC Mortgage, LLC is registered as a corporation in Illinois and regularly engages in the practice of collecting debts.

7. Defendants are debt collectors as defined by the FDCPA § 1692a(6) and thereby are subjected to the Act when engaged in debt collection efforts such as the filing of a foreclosure action against Plaintiff.

## FACTUAL ALLEGATIONS

8. A Complaint to Foreclose was filed against William Bush and his wife Brenda for their home located at 6053 S. Campbell, Chicago, IL 60629.

9. The summons was not given to either William or Brenda Bush, or anyone else in their household.

10. According to the Affidavit of Special Process Server, William and Brenda Bush were served at their home on 9/23/2008 at 6:46 p.m.. However, neither William nor Brenda Bush were home at that time. They were, in fact, taking two of their church congregation members - Nancy Hunt and Marie Rucker - to Church that evening. See Exhibit A and Exhibit B incorporated herein.

11. Nancy Hunt was picked up from her home at 1211 W. Marquette, Chicago, Illinois by William and Brenda Bush at 6:00 p.m. and rode with them to their church meeting. (See Exhibit A)

12. Marie Rucker was picked up from her home at 6739 S. Throop St. Chicago, Illinois at by William and Brenda Bush at 6:15 p.m. and rode with them to their church meeting. (See Exhibit B)

13. On 9/23/2008, William and Brenda Bush attended church service from 6:30-9:00 p.m. and did not return home until approximately 9:30 p.m., having never received a copy of the summons which was allegedly served upon them at their home. Please see the affidavits from Nancy Hunt and Marie Rucker, incorporated herein as Exhibit A and Exhibit B, where they attest to being with the Bush's at the times mentioned above.

14. Neither William or Brenda Bush have attended any of the proceeding in this matter.

15. A judgment was entered on February 25, 2009.

16. Plaintiff has good reason to believe that the judgment entered on 2-25-2009 was obtained by Defendant's attorney committing fraud upon the Court.

17. As will be further shown, Defendants conspired together to wrongfully foreclose on the Bush's home.

18. The Bush's contends that said sale was wrongful, illegal, in violation of law and the documents governing the relationship between the Browns and the owners of the Brown's mortgage.

19. The Bush's contend that the foreclosing entity lacked standing to initiate a foreclosure and that the foreclosure is void or at least voidable and that no title has passed to Defendant GMAC as there was no legal title to pass to it from the originating entity.

20. Plaintiffs allege that the actions of Defendants and their agents, employees and servants were wrongful and tortious.

21. Plaintiffs allege that the actions of the foreclosing entity were wrongful and tortious.

22. Plaintiffs allege that the actions of Defendants in wrongfully foreclosing is a violation of law, wrongful and tortious and that GMAC held no title to their home or property, and that its actions constitute negligence, wantonness, abuse of process and slander of title.

23. Plaintiffs  allege that the actions of Defendants and their employees, agents and servants were a civil conspiracy to deprive them of their property. Additionally, Defendants GMAC and the Law Office of Ernest Codilis are in a joint venture wherein these parties were engaged in a civil conspiracy to falsify legal documents for the purpose of foreclosing on the homes of individuals under a colorable title of right for the purpose of generating profits and income from the act of depriving individuals of their homes and for the purpose of unjustly enriching the participants of the joint venture at the expense of the unsuspecting and unknowing.

24. Plaintiffs allege that GMAC had the right to choose and control the attorneys who it hired to foreclose on their loan and by having such control are liable for the wrongful and tortious conduct of their agents, employees and servants.

25.  Plaintiff is the nominal payor on the subject promissory Note. The Loan Seller is a financial institution that was paid a fee to pose as a residential mortgage lender, when in fact the source of loan funds and the actual lender (Investors in Certificates) and underwriter (Mortgage Aggregator and Investment Banker) were other parties whose identities and receipt of fees and profits were withheld from Plaintiff at Closing and despite numerous requests continue to be withheld from Plaintiff by the Defendants contrary to the requirements of Federal Law and applicable State Law.

26.  Unknown to Plaintiff, the Loan Seller, acting as principal in its relationships with the "independent appraiser" of the property and the mortgage broker and mortgage originator, induced the Plaintiff into a transaction that did not and could not meet normal underwriting standards for a residential mortgage. The Loan Seller posed as a conventional mortgage lender thus leading Plaintiff to reasonably believe that the Loan Seller, the mortgage broker, and the loan originator had an interest in the success( repayment of the loan) of the transaction that Plaintiff was induced to believe was being executed at the time of the "closing" of the subject loan transaction.

27. In fact, the Loan Seller, mortgage broker, appraiser, loan originator, title agent, escrow agent and Trustee on the mortgage, had no financial stake (i.e., liability) in the transaction and no interest other than obtaining Plaintiff's signature on a "loan" that could never be repaid, contrary to representations and assurances from the conspiring participants in this fraudulent scheme. In fact, the "Appraisal" was intentionally and knowingly inflated along with other loan data to justify the closing of the "loan transaction." Plaintiff relied upon the due

diligence of the apparent "Lender" (i.e., actually the Loan Seller) in executing the and accepting the closing documents.

28. In fact, no "lender" was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money in a residential loan closing. Thus no bank or other financial institution actually performing under the standards, rules and regulations governing such institutions was the "lender" which is the basis for Plaintiff's cause of action for usury, to wit: that the inflated appraisal added an undisclosed cost to the loan which when added to the other terms, disclosed and undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the State legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and mislead the Plaintiffs as to the real parties in interest and the fees generated by the production of the subject "loan transaction."

29. Their purpose was solely to collect fees, rebates, kickbacks and profits that were never disclosed to Plaintiffs and have only recently been discovered by Plaintiffs through consultation with experts in securitization of residential mortgage loans, and diligent research including the filings of some parties with the Securities and exchange Commission which disclose the normal manner of operating this fraudulent scheme.

30. The Loan Seller was named as the Payee on the subject promissory note and the beneficiary under the mortgage terms allegedly securing the performance under the subject note. The "Trustee" was named as the Trustee on the mortgage executed at the time of the alleged

"closing" of the "loan transaction." In accordance with State law, the Deed and terms of security were recorded in the county records.

31. Notwithstanding the above, and without the knowledge of the Plaintiffs, the Loan Seller had entered into Assignment and Assumption Agreements with one or more parties and Pooling and Service Agreements with one or more parties including but not limited to the mortgage aggregator prior to or contemporaneously with the "Closing" of the subject "loan transaction." Under the terms of these agreements, the Loan Seller received a sum of money, usually on receiving an application for a loan equal to the gross amount of the loan sought by Plaintiffs plus a fee of 2.5% or more which was allocated to the subject loan transaction.

32. Contrary to the documents presented before and during the "closing" of the "loan transaction" the Loan Seller was neither the source of funding nor the "Lender." Thus at the time of recording, the source of funding and the "Lender" was a different entity than the nominal mortgagee or beneficiary under the mortgage and was neither named nor disclosed in any fashion. The security for the "loan" thus secured an obligation that had been paid in full by a third party. Said third party(ies) was acting as a financial institution or "Lender" without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of State or Federal authorities and/or agencies.

33. Some form of documentation represented by the Loan Seller to the Mortgage Aggregator was presented before or contemporaneously with the "closing" of the "loan" transaction. In some cases the documentation included actual copies of the documents presented at "Closing." In most cases it consisted of either forged blank notes or vague descriptions of the content of the notes that were placed into the pool of assets that would be "securitized." Plaintiff

has discovered numerous cases in which the "loan closing" either did not take place at all or included documentation substantially different than the original offer and acceptance and substantially different than what could have been reported to the Mortgage Aggregator prior to the "closing." Plaintiffs have discovered numerous cases in which foreclosure has proceeded despite the fact that no loan closing was ever consummated, no papers were ever signed, or the loan was properly rescinded properly under law.

34. Plaintiffs do not know what version of documentation was presented to the Mortgage Aggregator and if the Mortgage Aggregator took one or more varying descriptions of the alleged "loan documents" into more than one pool of assets which was eventually sold for the purpose of securitizing the assets of the pool which included the subject loan transaction either once or more than once. Plaintiffs have requested such information numerous times only to be met with complete silence from the Defendants.

35. There is no assignment of the subject mortgage in the county records, but there is a non-recorded Pooling and Services" Agreement and a non-recorded Assignment and Assumption Agreement which appears to substitute the Trustee over the pooled assets for the nominal Trustee in the mortgage. The powers of this second Trustee were in turn transferred to either a Trustee for a Special Investment Vehicle (which performed the accounting and reporting of the pool assets) or to an investment bank Collateral Debt Obligation manager whose department performed the accounting and reporting of the pool assets. The reporting of the pool assets consisted principally of descriptions of the notes "signed" by borrowers and limited descriptions of the general terms of the note such that the note appeared to be more valuable than the initial terms of payment by the "borrower."

36. The note from the subject "loan transaction" was eventually allocated into a new corporation (Special Purpose Vehicle) formed for the express purpose of holding the pooled assets under certain terms. The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated "loan transactions" contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees associated with only that specific "loan transaction." Whether such "deficiency" was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the "borrower" is not known, despite numerous requests for accounting and the refusal of Defendants to provide any such information.

37. The Investment Banking firm arranged through payment for a false inflated appraisal of the certificates and/or issuer of the certificates that would be sold to investors in much the same way as it had procured the false appraisal of the property that "secured" the "loan transaction." In addition, insurance was purchased from proceeds of this transaction, credit default swaps were purchased from proceeds of this transaction, the investors investments were "oversold" to create a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created cross-collateralization agreements and overcollateralization of the pool assets to assure payments to the investors, thus creating co-obligors on the payment stream due from the Plaintiffs on the subject "loan transaction."

38. The pool assets, including the Plaintiff's subject "loan transaction "were pledged completely to the owners of the "asset-backed securities." All the certificates were then transferred to a Seller who in turn sold the certificates in varying denominations, each of which

had slightly different terms depending upon which segment of the pool (tranche) secured the investment.

39. If there is a holder in due course of the Plaintiff's note arising from the subject "loan transaction" it is the investors who purchased said securities (certificates). Some of said securities are held by the original purchaser thereof, others were sold at weekly auction markets, others were paid by re-sales of property that was "secured", others were paid from prepayments, others were paid by sale at full or partial price to the investment bank that originated the entire transaction, some of which might be held by the Federal Reserve as non-recourse collateral, and others might have been paid by one or more of the insurance, credit default swaps, cross guarantees or cross collateralization of the segment of the pool that secured the relevant investor who owned certificates backed by a pool of assets that included the subject "loan transaction."

40. It is doubtful that any of the Defendants have any knowledge or have made any effort to determine whether the putative holders in due course have been paid in whole or in part. It can only be said with certainty that these Defendants seek to enforce loan documents for which they have already been paid in full plus illegal fees for participating in an illegal scheme. These Defendants seek to add insult to injury by demanding ownership of the property in addition to the receipt of payment in full long before any delinquency or default even allegedly occurred.

41. In order for these Defendants to maintain legal standing in connection with the subject loan transaction they are required to show the entire chain of title of the note and the entire chain of title of the mortgage. They have refused to do this despite numerous requests, leading Plaintiffs to conclude that the Defendants cannot produce such evidence of a complete

chain of title or are intentionally withholding the information that would show breaks in such chain.

42. Plaintiffs are left in the position of being in an adversary proceeding with ghosts. While these Defendants have informally offered or considered providing indemnification for any third party claims, the fact remains that any relief awarded these defendants, any standing allowed to these defendants would expose the Plaintiffs to multiple claims and suits from an unknown number of parties and entities that all claim, possibly correctly, to the holders in due course. Any grant of ac certificate of title to an entity other than Plaintiffs or the nominal mortgagee creates an incurable defect in title.

43. There is no recording of any document in the county records which predates the Defendants' attempt to initiate foreclosure and/or eviction or which would authorize them to proceed.

44. Significance of REMIC - - Mortgage backed Securities (MBS) Certificates are "pass through Certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G. REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions which it may not undertake (i.e. "prohibited transactions"). Any violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificate holders. For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%. The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the

Trust and the Certificate holders for the entire amount of the tax. Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.

45. A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date, (2) was purchased by the REMIC Trust within 3 months after the startup date or (3) any qualified replacement mortgage.

Permitted investments are limited to:

a. Cash Flow Investments (i.e. temporary investment where the Trust holds money it has received from qualified mortgages pending distribution to the

Certificateholders);

b. Qualified Reserve Assets (i.e. any intangible property which is held for investment and is part of a reasonably required reserve to provide for full payment of expenses of the REMIC or amounts due on regular interests in the event of defaults on qualified mortgages or lower than expected returns on cash flow investments. These investments are for very defined purposes and are to be passive in nature. They must be "reasonably required."

c. Liquidation Proceeds from "foreclosed property" which is acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust.

46. In order to maintain the REMIC status, the Trustee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment." 26 U.S.C. § 806F(a)(2)(B). Prohibited Transactions include the disposition of a

qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a Qualified Mortgage or a Permitted Investment. 26 U.S.C. § 860F(a)(2)(B). Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. § 860F(a)(1).

47. Contributions of any "property" — e.g., cash, mortgages, etc. — made to the REMIC are taxed at 100% of the contribution, except for the four following exceptions:

a. Contributions to facilitate a "clean up call" (i.e. the redemption of a class of regular interest, when by reason of prior payments with respect to those interests the administrative costs associated with servicing that class outweigh the benefits of maintaining the class). Reg. § 1.860G-2(j)(1).

b. Any cash payment in the nature of a guarantee, such as payments to the REMIC Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest. These taxes and penalties are ultimately borne by the Certificate holders. under a surety bond, letter of credit or insurance policy.

c. Any cash contribution during the three month period after the start-up day; and

d. Any cash contribution to a qualified reserve fund made by a holder of a residual interest.

48. On a monthly basis, the Investment Banking firm and/or its agents, servants or employees compiled, individually and in concert, oversaw and approved all the information contained in the Distribution Reports and electronically sent same to certain parties. The data

regarding the number of bankruptcies, aggregate Special Servicing Fees, and aggregate Trust Fund Expenses was routinely incomplete, false, and/or misleading.

49. The Distribution Reports are supposed to accurately reflect the "financial health of the trust," and provide Certificate holders ,with important data such as the number of loans in bankruptcy, the aggregate amount of special servicing fees, and the aggregate amounts of trust fund expenses. Each and every one of these categories is essential for to assess its profit and loss potential in the REMIC entity. Furthermore, this data is used by bond rating agencies to assess the value of the Certificates.

50. Based upon the filings and information of the Plaintiffs it appears that no accurate accounting has ever been presented to anyone and that therefore the identity and status of any putative holder in due course is completely shrouded in secrecy enforced by these Defendants, their agents, servants and employees. Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to Borrowers where the repurchase was, as was usually the case, the far less than the original investment. While the Plaintiffs would never have entered, into a transaction in which the true nature of this scheme was revealed, any profits, refunds, rebates, fees, points, costs or other income or gain should be credited on some basis to said borrowers including Plaintiffs herein.

51. The end result of the false and misleading representations and material omissions of Defendants as to the true nature of the mortgage loan actually being processed, which said Defendants had actual knowledge was in direct conflict with the original Uniform Residential Loan Application, early TIL, and Plaintiffs' stated intentions and directions to said Defendants, at

the time of original application for the loan, fraudulently caused Plaintiffs to execute predatory loan documents.

52. At no time whatsoever did Defendants ever advise Plaintiffs that:

(a) the mortgage loan being processed was not in their best interest;

(b) the terms of the mortgage loan being processed were less favorable than the fixed-rate loan which Defendants previously advised Plaintiffs that they qualified for;

(c) that the adjustable rate mortgage loan was an inter-temporal transaction (transaction where terms, risks, or provisions at the commencement of the transaction differ at a later time) on which Plaintiffs had only qualified at the initial "teaser" fixed rate but had not and could not qualify for the loan once the interest rate terms changed after year 2;

(d) that as a result of the change in interest rate after year 2 that Plaintiffs would not be able to meet their financial obligations on the loan given their income and expense history previously provided to Defendants;

(e) that Plaintiffs would likely be placed in a position of default, foreclosure, and deficiency judgment upon not being able to meet their increased loan obligations once the fixed rate interest period expired and the adjustable rate applied;

(f) that the originating "lender", that being Defendant ENCORE, had no intention of retaining ownership interest in the mortgage loan or fully servicing same and in fact may have already presold the loan, prior to closing, to a third party mortgage aggregator;

(g) that the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers (including but not limited to Defendants DOES 1-10), for the ultimate purpose of bundling the Plaintiffs' mortgage with hundreds or perhaps thousands of others as part of a companion, support, or other tranche in connection with the creation of a REMIC security known as a Collateralized Mortgage Obligation ("CMO"), also known as a "mortgage-backed security" to be sold by a securities firm (and which in fact ended up as collateral for Asset-Backed Securities Certificates, created the same year as the closing);

(h) that the mortgage instrument and Promissory Note may be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the Promissory Note may not be in privity with or have the legal right to foreclose in the event of default;

(i) that in connection with the multiple downline resale and assignment of the mortgage and Promissory Note that assignees or purchasers of the Note may make "paydowns" against the Note which may effect the true amount owed by the Plaintiffs on the Note;

(j) that a successive assignee or purchaser of the Note and Mortgage may not, upon assignment or purchase, unilaterally impose property insurance requirements different from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without the Plaintiffs' prior notice and consent.

53. As a result of the closing and in connection therewith, Defendants placed the Plaintiffs into a sub-prime adjustable rate mortgage program, with Defendants intentionally misleading Plaintiffs and engaging in material omissions by failing to disclose to Plaintiffs the

fact that the nature of the mortgage loan application had been materially changed without Plaintiffs' knowledge or consent and that Plaintiffs were being placed into an adjustable rate mortgage program despite not being fully qualified for such a program.

54. Prior to the closing, Defendant failed to provide to Plaintiffs the preliminary disclosures required by the Truth-In-Lending Act pursuant to 12 CFR (also known as and referred to herein as "Regulation Z) sec. 226.17 and 18, and failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24 CFR sec. 3500.6 and 35007, otherwise known as the GFE.

55. Defendant also intentionally failed and/or refused to provide Plaintiffs with various disclosures which would indicate to the Plaintiffs that the consumer credit contract entered into was void, illegal, and predatory in nature due in part to the fact that the final TIL showed a "fixed rate" schedule of payments, but did not provide the proper disclosures of the actual contractually-due amounts and rates.

56. Defendants failed and/or refused to provide a HUD-1 Settlement Statement at the closing which reflected the true cost of the consumer credit transaction. As Defendants failed to provide an accurate GFE or Itemization of Amount Financed ("IOAF'), there was no disclosure of a Yield Spread Premium ("YSP", which is required to be disclosed by the Truth-In-Lending Act) and thus no disclosure of the true cost of the loan.

57. As a direct and proximate result of these failures to disclose as required by the Truth-In—Lending Act, Defendant MORTGAGE BROKER received a YSP in a substantial amount of without preliminary disclosure, which is a per se violation of 12 CFR sec. 226.4(a), 226.17 and

18(d) and (c)(1)(iii). The YSP raised the interest rate which was completely unknown to or approved by the Plaintiffs, as they did not received the required GFE or IOAF.

58. In addition, the completely undisclosed YSP was not disclosed by Defendant in their broker contract, which contract was blank in the area as to fees to be paid to Defendant. This is an illegal kickback in violation of 12 USC sec. 2607 as well as State law which gives rise to all damages claims for all combined broker fees, costs, and attorneys' fees.

59. The Amount Financed within the TEL is also understated which is a material violation of 12 CFR sec. 226.17 and 18, in addition to 15 USC sec. 1602(u), as the Amount Financed must be completely accurate with no tolerance.

60. Defendants were under numerous legal obligations as fiduciaries and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper, and that Plaintiffs received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after the closing.

61. Plaintiffs, not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon the Defendants to insure that the consumer credit transaction was legal, proper, and. complied with all applicable laws, rules, and Regulations.

62. At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four (4) installments and was initially payable to the person the subject of the transaction, rendering Defendants "creditors" within the meaning of the Truth-In-Lending Act, 15 U.S.C. sec. 1602(f) and Regulation Z sec. 226.2 (a)(17).

63. At the closing of the subject "loan transaction", Plaintiffs executed Promissory Notes and Security Agreements in favor of Defendants as aforesaid. These transactions, designated by Defendants as a Loan, extended consumer credit which was subject to a finance charge and which was initially payable to the Defendants. As part of the consumer credit transaction the subject of the closing, Defendants retained a security interest in the subject property which was Plaintiffs' principal residential dwelling.

64. Defendants engaged in a pattern and practice of defrauding Plaintiffs in that, during the entire life of the mortgage loan, Defendants failed to properly credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees. At all times material, Defendants had actual knowledge that the Plaintiffs' accounts were not accurate but that Plaintiffs would make further payments based on Defendants' inaccurate accounts. Plaintiffs made payments based on the improper, inaccurate, and fraudulent representations as to Plaintiffs' accounts.

65. As a direct and proximate result of the actions of the Defendants set forth above, Plaintiffs overpaid in interest. Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure. Defendants' violations were all material in nature under the Truth-In-Lending Act.

66. Said violations, in addition to the fact that Plaintiffs did not properly receive Notices of Right to Cancel, constitute violations of 15 USC sec. 1635(a) and (b) and 12 CFR sec. 226.23(b), and are thus a legal basis for and legally extend Plaintiffs' right to exercise the remedy of rescission.

67. Defendants assigned the Note and mortgage to parties who did not take these instruments in good faith or without notice that the instruments were invalid or that Plaintiffs had a claim in recoupment. Pursuant to U.C.C. sec 3-305(b, Defendants are not a holder in due course and is thus liable to Plaintiffs, individually, jointly and severally.

68. On information and belief and given that the consumer credit transaction was an inter-temporal transaction with multiple assignments as part of an aggregation and the creation of a REMIC tranche itself a part of a predetermined and identifiable CMO, all Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiffs out of the proceeds of the loan; acted in concert to wrongfully deprive the Plaintiffs of their residence; acted in concert and conspiracy to essentially steal the Plaintiffs' home and/or convert the Plaintiffs' home without providing Plaintiffs reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of the RICO statute.

69. On information and belief and given the volume of residential loan transactions solicited and processed by the Defendants, the Defendants have engaged in two or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

*Industry History Which Forms Basis for Underlying Claims*

70. Liability of Defendants is based upon both their gross departure from federal lending standards as well as one of largest financial scandals ever perpetuated by various entities which

are directly and indirectly involved in the lending industry. The foregoing conduct, (which is specifically described infra), has caused Plaintiffs to obtain a loan which; 1) were originated based upon false and inflated values, 2) required payments that Plaintiffs were not able to consistently make, and, 3) resulted in Plaintiffs losing possession of their homes or to be in the process of losing possession of their homes.

71. The citizens of the State of Illinois are some of the hardest hit victims of the nationwide mortgage crisis. The main causes of this crisis are an industry-wide departure from federal lending standards as well as the greed of Wall Street financial institutions who have chosen to abuse the judicial foreclosure procedures codified in Illinois Compiled Statutes 735 ILCS 5/15 in order to illegally claim certain taxation benefits provided for in Internal Revenue Code Section 1080.

72. Through departing from federal lending standards and blatantly violating these statutes, Defendants have been able to; 1) claim that Plaintiffs' properties have been validly sold at a public foreclosure auction that never actually took place, 2) record title issued by foreclosure trustees who as a matter of practice falsify deeds after the sale to make it appear that a public foreclosure auction took place, and, 3) obtain a full satisfaction of the loan balance which encumbers Plaintiffs' properties through falsely claiming the tax benefits delineated in Internal Revenue Code Section 1080 and by avoiding capital gains taxes in reselling the property.

### *History of Federal Lending Guidelines*

73. In December of 1992, the Office of the Comptroller Currency , the Federal Reserve, the Federal Deposit Insurance Corporation and the Office of Thrift Supervision adopted real estate lending standards pursuant to the Federal Deposit Insurance Corporation Improvement Act of 1991. These standards established loan to value limits for residential lending. Mainly, residential real estate loans were; 1) not to exceed 90% of a property's value, and, 2) required evidence of a borrower's ability to perform under the loan. The purpose of the Act was to strength and stabilize the country's real estate market which at the time had fallen into a deep slump.

### *The Departure from Federal Lending Guidelines*

74. As time went on, the United States begin experiencing robust. economic growth. As the economy improved, so did the real estate market. As a result of rapid growth in the lending arena, the industry was no longer dominated by banks that lent funds on deposit (hereinafter "direct lenders"). Instead, it spawned more and more businesses that would act as intermediaries between borrowers and several potential lenders (hereinafter after "mortgage brokers").

75. The proliferation of mortgage brokers created a highly competitive landscape in the lending industry. As such, in order to keep profits high, direct lenders and mortgage brokers alike began to relax the standards necessary for a borrower to obtain a loan (hereinafter "underwriting guidelines"). As a direct result, loan origination began to rapidly depart from the federal

guidelines discussed above. Unfortunately, the federal government did nothing to curtail this practice.

### The Real Estate Boom Fueled by REMICS

76. As a result of rapidly increasing real estate values, investors want to "cash in" on the boom. As a result of this desire, Wall Street decided to create investment vehicles which would fund and manage bundles of subprime mortgages. This led to the proliferation of special tax treatment vehicles known as Real Estate Mortgage Investment Conduit (hereinafter "REMIC").

77. The REMIC is formed as a trust, corporation, or limited liability company. Created as a result of the Tax Reform Act of 1986, such an investment vehicle is unique in the manner in which it pays taxes. Mainly, a REMIC allows its investors to avoid double taxation by "passing through" income to the holders of the REMIC'S Regular Interest and Residual Interests directly to individual investors.

78. The instruments used to "pass through" the income are "Mortgage Asset- I Backed Pass-Through Certificates" (hereinafter " MBCS"). These certificates are issued by the REMIC and sold to investors. The funds collected allow the REMIC to acquire several different loans within 90 days after its creation. The administration of a REMIC is governed by a "Mortgage Pooling and Servicing Agreement" (hereinafter "MPSA"). This document identifies a "Master Service?", who services the loans in the pool, a "Primary" or "Sub-Servicer", who usually is the originator of the loan and delegated duties by the Master Servicer, and the "Trustee" who is responsible for holding loan documents and distributing payments to the holders of the MBCS.

79. As the housing boom went into full swing, REMIC's were able to buy up and service pools of subprime loans. In addition, investing in these vehicles created higher return simply based upon cause and effect. Mainly, as housing prices rose, the corresponding risk associated with subprime mortgages secured by the MBCS dropped. The foregoing dramatically raised the REMIC'S rating. This caused more and more investors to jump into the subprime loan market and therefore increased demand for the origination of such loans.

80. Based upon the easy funding provided by MBCS, coupled with lending guidelines that had greatly departed from federal lending guidelines, borrowers who had once been required to provide detailed proof of their income, source of down payment, credit history, debt, and the value of the secured property, suddenly qualified for loans with little or no verification at all. In addition, they were able to obtain loans the value of which greatly exceeded the value of the subject property. Finally, as these loans were subprime, their interest rate was certain to jump dramatically within a short period of time after origination. However, the "bubble" was soon to "burst".

### Market Decline Leads to Non-Judicial Foreclosure

81. Unfortunately, by late 2006, real estate values hit a sharp decline. Shortly thereafter, the economy hit a 20 year low. The borrowers who had obtained the subprime loans funded by the MBCS were negatively impacted by the economy and therefore unable to keep up with the payments on the subprime loans secured on their property. In addition, in many case, their interest rate had already adjusted upwards. As a result, borrowers began to default on these loans.

Under 735 ILCS 5/15, lenders were required to counsel borrowers "in person" or "by telephone" before recording a notice of default. However, all of the defendants in this action merely ignored this requirement.

82. The Plaintiffs in this action were amongst those victimized. As a result of the above-described circumstances, many of the Plaintiffs' properties were placed into the judicial foreclosure process pursuant to the dictates of 735 ILCS 5/15 However, as history has shown, "the house always wins" and Defendants were therefore able to successfully exploit 735 ILCS 5/15 to their advantage despite the irreparable harm it did to borrowers like Plaintiffs, despite the fact that doing so has; 1) destroyed Plaintiffs' credit, 2) drained. all of their financial resources, and, 3) caused them to lose possession of their homes as a direct result of illegal foreclosure sales.

### Sham Foreclosure Sales Allow Defendant to Reap Tax Benefits

83. Illinois is considered a "judicial" foreclosure state. Importantly, when a borrower is delinquent in making payments, a "judicial" foreclosure allows the property to be sold at a public auction.

84.    The process begins when a "Notice of Default" is recorded against the subject property. A couple of months later a trustee company, (one which takes possession of the deed for the sole purpose of sale), substitutes in as the beneficiary so that it can be sold. Finally, a "Notice of Trustee's Sale" is issued. This document identifies the minimum bid, (usually the

amount owed on the delinquent loan), that the lender is seeking at the sale. All of the foregoing events are required to be published in a newspaper of general circulation.

85. On the day of the sale, a public auction conducted within the dictates of 735 ILCS 5/15. supposedly occurs. However, at the time set for sale the actual bidder does not show, thereby leaving the bidders scratching their heads as no public sale actually occurs. Several days later when the deed from the subject property records, the title issued by the judicial selling company on its face improperly and incorrectly states that an auction took place and that cash was paid.

86. However, the sale is a sham as the purchaser of the property is in fact the REMJC which ironically already owns the loan. This is reflected by the fact that the subject property is now in the naive of the RENIIC which secured its MBCS on the subject property. In addition, the deed will reflect a purchase price which is usually 60% less than the minimum bid sought at the auction.

87. Although on its face this appears to be a legitimate sale, in reality it is a complete and total sham as; 1) no consideration was actually paid, 2) the REMIC is not -.a "bona fide purchaser" within the meaning of 735 ILCS 5/15, 3) the sham sale was conducted for the purpose of allowing the holders of the MBCS to avoid federal tax liability, and, 4) the REMIC is able to insure that the face value of the MBCS are maintained.

88. The logic for engaging in the above highly illegal conduct is simple. Were the lender to retake ownership of the subject property, Internal Revenue Code 1038 forbids it from claiming a loss. However, by orchestrating the above described scam, the lender is able to claim a loss.

Specifically, the REMIC makes a determination as to the maximum amount of tax benefit it can claim. It then subtracts this amount from the balance due on the defaulted loan. The difference between these numbers is then placed on the deed after the sale as the amount the REIVIIC supposedly tendered for the subject property.

89. Since the lender is normally the servicer, this "loss" directly benefits the holders of the MBCS. These holders can claim the loss as an offset to revenue, with the end effect being a tax-fee stream of revenue. However, they now possess a property on which they have collected "pass through" income from the borrower over the last several years. As a result, they have obtained multiple benefits through; 1) several years of interest income, 2) a substantial "loss" which will allow the MRCS to offset taxation on that income, 3) a property that it owns free and clear, and, 4) the ability to encumber the property so as to create a stream of income without incurring capital gains tax liability.

### Plaintiffs are the Losers in the End

90. Plaintiffs are the victims and eventual losers at the end of the aforementioned scheme. If Defendants would have followed the required lending standards, discussed supra, Plaintiffs would have obtained an affordable loan or been denied the loan that eventually led to their forcible removal from their home and destruction of their credit.

91. Plaintiffs, as a result of the scheme perpetrated against them, are forced to incur thousands of dollars in fees in an effort to modify this predatory loan.

92. Based upon basic contract principals enunciated in both statutory and case law, Plaintiffs are actually entitled to the return of the subject property for the amount contained in the deed after sale. Furthermore, Plaintiff is entitled to compensation for fees and costs incurred in efforts to modify their loan.

93. As a direct result of the acts complained of, the Bushes have been caused to suffer great mental anguish, economic and emotional damages and claim from the defendants all damages allowable under the law.

## COUNT I

### FDCPA § 1692f

94. Plaintiffs incorporate and re-allege paragraphs 1-93 above.

95. 15 U.S.C. § 1692f in pertinent part provides:

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

96. Defendants violated 15 U.S.C. sec 1692f.

## COUNT II

### FDCPA § 1692e(2)(A)

97. Plaintiff incorporates paragraphs 1-128 above.

98. 15 U.S.C. §1692e states that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt" and sets forth activities that violate this section, including 15 U.S.C. §1692e(2).

99. 15 U.S.C. §1692e(2) provides in pertinent part that a debt collector violates this section with the following activity:

The false representation of (A) the character, amount, or legal status of any debt.

100. The claim in the foreclosure action against the Bush's that Defendants' client was assigned the debt was a false representation of the character, amount, or legal status of the debt.

101. This claim was verified by Defendant Ernest Codilis.

102. Defendants violated 15 U.S.C. §1692e(2)(A).

## COUNT III

## FDCPA § 1692e(5)

103. Plaintiff incorporates paragraphs 1-102 above.

104. 15 U.S.C. §1692e states that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt" and sets forth activities that violate this section, including 15 U.S.C. §1692e(2).

105. 15 U.S.C. § 1692e(5) provides in pertinent part that a debt collector violates this section with the following activity:

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

106. Defendants attorney Ernest Codilis threatened and took an action that could not legally be taken when it filed the foreclosure prior to the mortgage and note being assigned to their client.

107. Defendants violated 15 U.S.C. §1692e(5).

## COUNT IV

## NEGLIGENCE

108. Plaintiff incorporates paragraphs 1-107 above.

109. GMAC and Ernest Codilis negligently attempted to eject the Plaintiffs from the home they rightfully own since the foreclosure performed by Ernest Codilis is void.

110. As a direct result of Defendants' negligence, the Plaintiffs were injured and damaged as alleged above and has suffered mental anguish, economic injury and all other damages allowed by law.

111. As a result thereof, the Defendants are liable for all natural, proximate and consequential damages due to its negligence.

## COUNT V

## WANTONNESS

112. Plaintiff incorporates paragraphs 1-111 above.

113. Defendants with reckless indifference to the consequences, consciously and intentionally attempted to eject the Bushes from the home they rightfully own.

114. GMAC with reckless indifference to the consequences, consciously and intentionally instituted this action with the knowledge that the home of the Bushes did not belong to GMAC.

115. These actions were taken with reckless indifference to the consequences, consciously and intentionally in an effort to increase profits for GMAC.

116. As a result thereof, Defendants are liable for all natural, proximate and consequential damages due to their wantonness as well as punitive damages upon a proper evidentiary showing.

## COUNT VI

### SLANDER OF TITLE

117. Plaintiff incorporates paragraphs 1-116 above.

118. GMAC and Ernest Codilis in filing a foreclosure deed – which is void - has caused a cloud to be placed on the title of the property of the Bushes.

119. As the proximate cause of Defendant's said slandering of Plaintiffs title, Plaintiffs were caused to suffer injuries and damages and claim all damages allowable under law.

## COUNT VII

### RESPONDEAT SUPERIOR LIABILITY

120. Plaintiffs incorporate paragraphs 1-119 above.

121. GMAC hired, directed, or controlled the actions of Ernest Codilils and his employees and associates.

122. The Law Office of Ernest Codilis which is a third party defendant in this action, serves at the leisure of both the Trust and Trustee and / or is a part of a joint venture with the Trust and Trustee GMAC. These parties are alleged, upon information and belief, to be engaged in a civil conspiracy to engage in conduct which is unlawful for the purpose of unjustly enriching the members or participants in the joint venture.

123. GMAC is liable in tort for all of the wrongful actions of its agent, employee or servants, the Law Office of Ernest Codilis.

124. Plaintiffs claims all damages allowable under law for these wrongful actions.

## COUNT VIII

## NEGLIGENT OR WANTON HIRING, SUPERVISION, TRAINING OR RETENTION

125. Plaintiffs incorporate paragraphs 1-124 above.

126. GMAC negligently or wantonly hired, trained, supervised or retained the third party defendant, the Law Office of Ernest Codilis.

127. As a result of this negligence or wantonness, depending on evidence adduced, Plaintffs were injured and damaged by the actions of Ernest Codilis.

128. As a result, GMAC is liable for all damages proximately and directly flowing from these actions by their agent, employee or servant, Ernest Codilis.

## COUNT IX

## JOINT VENTURE LIABILITY

129. Plaintiffs incorporate paragraphs 1-128 above.

130. GMAC and Ernest Codilis are part of a joint venture as defined by controlling law.

131. Each member of a joint venture is jointly and severally liable for any tortious act of any member of the joint venture against the Plaintiffs.

132. As a result thereof, the Plaintiffs re-allege in its entirety the complete third party complaint against GMAC and Ernest Codilis as grounds for their joint venturer liability.

133. As a result of the actions of the joint venturers, Plaintiffs have been injured and damaged as heretofore alleged.

134. Plaintiffs claim all damages as allowed by law for the wrongful acts of the joint venturers against them.

## COUNT X

## WRONGFUL FORECLOSURE

135. Plaintiff incorporates paragraphs 1-134 above.

136. GMAC and Ernest Codilis have completed a foreclosure proceeding against the Bushes in violation of law.

137. The initiation of the foreclosure proceeding by GMAC and Ernest Codilis was either negligent or wanton, depending on proof adduced at trial.

138. As a result thereof, Defendants are liable for all natural, proximate and consequential damages due to their actions including an award of punitive damages upon a proper evidentiary showing.

## COUNT XI

## UNJUST ENRICHMENT

139. Plaintiff incorporates paragraphs 1-138 above.

140. The actions of GMAC and Ernest Codilis in foreclosing on the home of Plaintiffs in violation of law resulted in Defendants being unjustly enriched by the payment of fees, insurance proceeds and equity in the home.

141. As a result of GMAC and Ernest Codilis' unjust enrichment, the Bushes have been injured and damaged in that the Bushes have lost their home and have lost any equity in their home resulting in financial and emotional damages including mental anguish.

142. Plaintiffs claim all damages allowable under law as a result of the Defendants' wrongful conduct and unjust enrichment.

## COUNT XII

## CIVIL CONSPIRACY

143. Plaintiff incorporates paragraphs 1-142 above.

144. GMAC and Ernest Codilis engaged in an unlawful combination and conspiracy to foreclose on home loans against individuals for the purpose of unjustly enriching themselves in violation of law. This unlawful activity had the effect of unjustly enriching the joint venturers and conspirators.

145. As a result of this civil conspiracy, civil wrongs were committed against the Bushes and other consumers. The motivation for the civil conspiracy was third party defendant's greed.

146. As a result of the civil conspiracy Plaintiffs claim all damages allowed by law.

## COUNT XIII

## FRAUDULENT MISREPRESENTATION

147. Plaintiff reaffirms and re-alleges the above paragraphs hereinabove as if set forth more fully here in below.

148. The title taken to the property by the Defendants is of no effect and void because the underlying foreclosure was commenced in violation of law on one or more of the following grounds:

a) The foreclosing entity lacked standing to foreclose; that is, it did not own the note and mortgage at the time that it instituted the foreclosure action.

b) The foreclosure was taken in violation of law in that the foreclosing entity did not own

the property upon which it foreclosed and therefore could pass no legal title to the lands it claimed to foreclose nor could it acquire legal title to the lands that it foreclose upon.

c) The foreclosure was taken in violation of law in that the default was exaggerated, inflated and based upon improper and illegal mortgage servicing practices on the part of the foreclosing entity and its agents or employees.

d) The foreclosure is voidable in that the foreclosure sale was completed by fraud, deceit or trickery on the part of the foreclosing entity and its agents, employees or servants in that the foreclosing parties represented that they would delay the foreclosure but then failed to do so.

e) The foreclosing entity failed to strictly comply with the requirements set out in Illinois law and the contract between the parties, with respect to notice, time and place and other legal provisions thereby rendering the foreclosure void.

f) The foreclosing entity failed to engage in loss mitigation required by its agreements and federal servicing guidelines which the entity is subject to, and because of the failure of the condition precedent to foreclosure the acceleration and default were invalid and illegal and renders the foreclosure void.

## COUNT XIV

## VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT

149. Plaintiff reaffirms and re-alleges paragraphs above herein as if specifically set forth more fully here in below.

150. As mortgage lenders, Defendants are subject to the provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 USC sec. 2601 et seq.

151. In violation of 12 USC sec. 2607 and in connection with the mortgage loan to Plaintiffs, Defendants accepted charges for the rendering of real estate services which were in fact charges for other than services actually performed.

152. As a result of the Defendants' violations of RESPA, Defendants are liable to Plaintiffs in an amount equal to three (3) times the amount of charges paid by Plaintiffs for "settlement services" pursuant to 12 USC sec. 2607(d)(2).

## COUNT XV

## VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT

153. Plaintiff reaffirms and re-alleges paragraphs above hereinabove as if set forth more fully here in below.

154. Defendants failed to include and disclose certain charges in the finance charge shown on the TIL statement, which charges were imposed on Plaintiffs incident to the extension of credit to the Plaintiffs and were required to be disclosed pursuant to 15 USC sec. 1605 and Regulation Z sec. 226.4, thus resulting in an improper disclosure of finance charges in violation of 15 USC sec. 1601 et seq., Regulation Z sec. 226.18(d). Such undisclosed charges include a sum identified on the Settlement Statement listing the amount financed which is different from the sum listed on the original Note.

155. By calculating the annual percentage rate ("APR") based upon improperly calculated and disclosed amounts, Defendants are in violation of 15 USC sec. 1601 et seq., Regulation Z sec. 226.18(c), 18(d), and 22.

156. Defendants' failure to provide the required disclosures provides Plaintiffs with the right to rescind the transaction, and Plaintiffs, through this public Complaint which is intended to be construed, for purposes of this claim, as a formal Notice of Rescission, hereby elect to rescind the transaction.

## COUNT XVI

## VIOLATION OF FAIR CREDIT REPORTING ACT

157. Plaintiff reaffirms and re-alleges paragraphs above as if set forth more fully here in below.

158. At all times material, Defendants qualified as a provider of information to the Credit Reporting Agencies, including but not limited to Experian, Equifax, and TransUnion, under the Federal Fair Credit Reporting Act. 65. Defendants wrongfully, improperly, and illegally reported negative information as to the Plaintiffs to one or more Credit Reporting Agencies, resulting in Plaintiffs having negative information on their credit reports and the lowering of their FICO scores.

159, Pursuant to 15 USC sec. 1681(s)(2)(b), Plaintiffs are entitled to maintain a private cause of action against Defendants for an award of damages in an amount to be proven at the

time of trial for all violations of the Fair Credit Reporting Act which caused actual damages to Plaintiffs, including emotional distress and humiliation.

160. Plaintiffs are entitled to recover damages from Defendants for negligent non-compliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(o).

161. Plaintiffs are also entitled to an award of. punitive damages against Defendants for their willful noncompliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(n)(a)(2) in an amount to be proven at time of trial.

## COUNT XVII

### FRAUDULENT MISREPRESENTATION

162. Plaintiff reaffirms and re-alleges paragraphs above as if set forth more fully here in below.

163. Defendants knowingly and intentionally concealed material information from Plaintiffs which is required by Federal Statutes and Regulations to be disclosed to the Plaintiffs both before and at the closing.

164. Defendants also materially misrepresented material information to the Plaintiffs with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

165. Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

166. Plaintiffs, not being investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

167. Had Plaintiffs known of the falsity of Defendants' representations, Plaintiffs would not have entered into the transactions the subject of this action.

168. As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiffs have suffered damages.


## COUNT XVIII

## BREACH OF FIDUCIARY DUTY

169. Plaintiff reaffirms and re-alleges paragraphs above as if set forth more fully here in below.

170. Defendants, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiffs which was not only to be best suited to the Plaintiffs given their income and expenses but by which Plaintiffs would also be able to satisfy their obligations without risk of losing their home, were "fiduciaries" in which Plaintiffs reposed trust and confidence, especially given that Plaintiffs were not and are not investment bankers, securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

171. Defendants breached their fiduciary duties to the Plaintiffs by fraudulently inducing Plaintiffs to enter into a mortgage transaction which was contrary to the Plaintiffs' stated

intentions; contrary to the Plaintiffs' interests; and contrary to the Plaintiffs' preservation of their home.

172. As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiffs have suffered damages.

173. Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a-callous and reckless disregard for the rights of the Plaintiffs justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a deterrent not only as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

## COUNT XIX

## CIVIL RICO

174. Plaintiff reaffirms and re-alleges paragraphs above as set forth more fully here in below.

175. The conspiracy the subject of this action has existed from date of application to the present, with the injuries and damages resulting and continuing.

176. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiffs constitutes an "enterprise.", with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiffs through the use of intentional nondisclosure, material misrepresentation, and creation of fraudulent loan documents.

177. Each of the Defendants is an "enterprise Defendant".

178. As a direct and proximate result of the actions of the Defendants, Plaintiffs have and continue to suffer damages.

## COUNT XX

## REFORMATION OF CONTRACT AGAINST DEFENDANT ORIGINATORS

## SERVICERS AND REM1CS ONLY

179. Plaintiffs incorporate herein by this reference each and every allegation contained in paragraphs 1 through 178 hereinabove as through fully set forth below.

180. Defendant Originators, Defendant Servicers, and Defendant REMICS and each of them, have knowingly concealed material facts and alternatively made false representations to Plaintiffs as follows:

a. Through intentionally concealing the value of Plaintiffs' properties in order to be able underwrite an inflated, subprime, and profitable loan;

b. Through falsely informing Plaintiffs that their properties had been sold for a specific sum at a valid foreclosure sale when .in fact the foreclosure sale was a sham....and... the...tender....of...the specific sum had never occurred;

c. Through concealing the fact from Plaintiffs that their loan was owned by certificate holders which would facilitate a sham foreclosure sale in order to reap gigantic tax benefits equivalent to receiving payment on 70-100% of the principal of the loan;

d. By representing that they had complied with the dictates of 735 ILCS 5/15 in counseling Plaintiffs "in person" or "by telephone" to explore options to foreclosure prior to recording a notice of default;

181. Defendant Originators, Defendant Servicers, and Defendant REMICS and each of them through engaging in the above conduct, were able . to enter into. written agreements with Plaintiffs in the form of mortgages and promissory notes secured by Plaintiffs respective properties. Because of the above-described fraud, these deeds of trust and promissory notes do not express the true intentions of the parties.

182. Plaintiffs and. Defendants have a complete mutual understanding of the essential terms of the contract, in' that Plaintiffs understood that their respective properties would be encumbered by a loan which was procured for the purpose of acquiring the subject property. However, Plaintiffs are the aggrieved parties in that they were not aware of the facts described above at the time they executed the contract.

183. As a result of Plaintiffs' ignorance of Defendants' true intentions, Plaintiffs are entitled to have their mortgages and accompanying promissory notes reformed to show the true intention of the parties. Such relief will entitle Plaintiffs to the return of title and possession of their respective properties with principal reduction of between 70%-100% of the loan.

## COUNT XXI

## INJUNCTIVE RELIEF AGAINST ALL DEHENDANTS

184. Plaintiffs incorporate herein by this reference each and every allegation contained in paragraphs 1 through 183 hereinabove as though fully set forth herein.

185. Plaintiffs are entitled to a preliminary injunction under Federal Rules of Civil Procedure 65 providing that Defendant Originators, Servicers, and REMICS return possession of Plaintiffs' property to them forthwith or that Defendant Trustee Companies abstain from conducting such sales based upon the facts that; 1) the foreclosure sale of Plaintiffs' homes was a sham, and 2) These defendants are obligated to service Plaintiffs' original loan for the price reflected on the deed recorded after sale.

186. If a preliminary injunction is not entered by this Court, Plaintiffs will suffer immediate and irreparable harm for there is no adequate remedy at law.. Plaintiffs have no adequate remedy at law, and there is a substantial likelihood that Plaintiffs will prevail on the merits at trial. The request for injunctive relief is narrow in scope and will preserve the party's rights until trial of this cause.

## COUNT XXII

## DECLARATORY RELIEF AGAINST ALL DEFENDANTS

187. Plaintiffs incorporate herein by this reference each and every allegation contained in paragraphs 1 through 186 hereinabove as though fully set forth herein.

188. An actual controversy has arisen and now exists between Plaintiffs and all Defendants concerning their rights in regard to their respective interests and rights in the properties subject of this action based upon; 1) the judicial foreclosure proceedings which were instigated.

189. Based upon the foregoing, Plaintiffs desire a judicial determination of their rights and duties in regards to the properties subject of this action.

## COUNT XXIII

## FRAUD BY CONCEALMENT AGAINST ALL DEFENDANTS

190. Plaintiffs incorporate herein by this reference each and every allegation contained in paragraphs 1 through 189 hereinabove as though fully set forth herein.

191. Defendants, and each of them, were parties to contractual agreements with Plaintiffs as Defendants were able to enter into written agreements with Plaintiffs in the form of mortgages and promissory notes secured by Plaintiffs respective properties.

192. Plaintiffs are informed, believe, and thereon allege that. Defendants, and each of them, knowingly, intentionally, or through tacit encouragement suppressed the true fact that Plaintiffs' home loan had been purchased by a REMIC.

193. Plaintiffs are informed, believe, and thereon allege those Defendants, and each of them, knowingly, intentionally, or through tacit encouragement suppressed the true fact that a valid foreclosure sale of the Plaintiffs' homes never actually took place.

194. Plaintiffs are informed, believe, and thereon allege those Defendants, and each of them, knowingly, intentionally, or through tacit encouragement suppressed the true fact that the REMIC who already owns the loan took title to Plaintiffs' property at the sham foreclosure sale.

195. Plaintiffs are informed, believe, and thereon allege those Defendants, and each of them, knowingly, intentionally, or through tacit encouragement, suppressed the true fact that no funds were actually transferred from the REMIC to the trustee at the time of sale.

196. At the time these failures to disclose and suppressions of facts occurred, and at the time Plaintiffs took the actions herein alleged, Plaintiffs were ignorant as to the existence of the aforementioned facts that the Defendants suppressed and failed to disclose.

197. Each of the aforementioned acts of suppression and concealment were committed by Defendants, and each of them, with the intent to deceive the Plaintiffs with whom Defendants contracted for the purposes of greed and profit.

198. Plaintiffs justifiably relied on the misrepresentations of Defendants due to Defendants' authority, positions, capacity, and expertise, resulting in a contractual agreement that did not reflect the Plaintiffs' true intent.

199. As a proximate result of above described fraud, Plaintiffs were induced to pay an excessive price for their homes, lose their homes in foreclosure as a result of these excessive prices, and have had their credit destroyed based upon their default being reported to the credit bureaus. As a result, Plaintiffs have been damaged in a manner that will allow them to have their mortgages and accompanying promissory notes reformed to show the true intention of the parties. Such relief will entitle Plaintiffs to the return of title and possession of their property. In addition, Plaintiffs have suffered monetary damages in amount which will be proven at the time of trial.

200. The above actions by Defendants were intentional and done with fraud, oppression, malice, and with conscious disregard for the safety and rights of others merely for monetary gain with no socially redeeming value whatsoever. As a result, Plaintiffs are entitled to an award of punitive damages against them.


**WHEREFORE,** William and Brenda Bush, having set forth his claims for relief against GMAC Mortgage, LLC, Ernest Codilis, and the Law Office of Ernest Codilis respectfully request of the Court as follows:

A. That the Bushes have and recover against GMAC Mortgage, LLC, Ernest Codilis, and the Law Office of Ernest Codilis a sum to be determined by a jury of their peers in the form of actual damages;

B. That the Bushes have and recover against GMAC Mortgage, LLC, Ernest Codilis, and the Law Office of Ernest Codilis a sum to be determined by a jury of their peers in the form of punitive damages;

C. That this Court enter an order voiding the foreclosure action of the Defendants; and

D. That the Bushes have such other and further relief as the Court may deem just and proper and equitable given the facts of the case.

## DEMAND FOR JURY TRIAL

William and Brenda Bush hereby demand a trial by jury on all claims so triable before the Court.

_____
**WILLIAM BUSH**
6053 S. Campbell
Chicago, IL 60629

_____
**BRENDA BUSH**
6053 S. Campbell
Chicago, IL 60629